IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

MONIQUE AMBER JONES,           )
                               )
                Plaintiff,     )
                               )
        v.                     )    Case No.
                               )    13-0259-REL-SSA
CAROLYN W. COLVIN, Acting      )
Commissioner of Social Security, )
                               )
                Defendant.     )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Monique Jones seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Title XVI of the Social

Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff's mental

impairment does not meet Listing 12.05(c), (2) in assessing plaintiff's residual functional

capacity because (a) plaintiff should have been found credible, and (b) plaintiff's mental

impairment is more severe than found by the ALJ, and (3) in relying on an improper

hypothetical. I find that the substantial evidence in the record as a whole supports the ALJ's

finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will

be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On September 15, 2010, plaintiff applied for disability benefits alleging that she had

been disabled since August 13, 2006.[1] Plaintiff's disability stems from agoraphobia, panic

attacks, major depressive disorder, and anxiety. Plaintiff's application was denied on

November 9, 2010. On December 8, 2011, a hearing was held before an Administrative Law

Judge. On January 24, 2012, the ALJ found that plaintiff was not under a "disability" as

_____

[1]Although supplemental security income is not payable prior to the month following the
month in which the application was filed, the ALJ considered the complete medical history (Tr.
at 13).

defined in the Act. On January 14, 2013, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

*III.*    *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

>       Yes = disabled.
>       No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Alissa Smith, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Disability Report - Field Office

On September 15, 2010, plaintiff met face to face with a disability interviewer who noted that plaintiff showed no difficulty with reading, understanding, coherency, concentrating, talking, answering, or writing (Tr. at 100).

### Function Report - Third Party

On September 23, 2010, plaintiff's mother completed a Function Report (Tr. at 120-127). Ms. Lancaster stated that she has to help plaintiff take care of her baby because plaintiff has a hard time due to her anxiety, depression and ADD. Plaintiff does not always bathe and comb her hair as often as she should. She is forgetful. Plaintiff prepares her own meals every day. Plaintiff is able to do laundry and dishes, but she needs constant reminding to do the laundry and she does not do dishes very often. Plaintiff does not go out alone because she is afraid something will happen to her. She is able to shop in stores once a week but someone accompanies her. "It takes quite a while because she can't decide on what to buy." Plaintiff has no hobbies and does not watch television. She used to read and write poetry and stories "all the time" but no longer does these things.

**Function Report**

In a Function Report dated September 23, 2010, plaintiff described her day as follows: "Wake up, feed baby, do household chores if I remember to do them, eat lunch but sometimes I forget, sometimes I take a shower, heat up food in Microwave for dinner, then go to sleep, but sometimes I do have a hard time sleeping." (Tr. at 147-154). At the time she completed this form, plaintiff had a six-month old daughter whom she cared for with the assistance of her mother and boyfriend. Plaintiff wrote, "I've always had problems with depression & anxiety so I've never been able to do much." Sometimes she goes 4 or 5 days without bathing; she does not comb or brush her hair most of the time. Plaintiff prepares her own meals every day. Plaintiff does laundry but has to be told multiple times to do it, and she does dishes sometimes. Plaintiff is able to use public transportation to get to her medical appointments. She is afraid to take her driver's test because she "wouldn't know the person" testing her. She is able to shop in stores once a week but she always has someone with her because she is afraid. It "takes a long time because I have a hard time deciding what to get." She has no hobbies because she is always depressed. She never does anything fun; she used to love to read.

I note that plaintiff had only one misspelled word in this 8-page handwritten form; her grammar was almost perfect even in the narrative remarks. On the final page, plaintiff's name was written in the box asking for the name of the person who completed the form. On a different form (a 3-page Missouri Supplemental Questionnaire), plaintiff indicated that her boyfriend helped her fill out the form because it was too overwhelming (Tr. at 157).

**B.    *SUMMARY OF MEDICAL RECORDS***

On November 8, 2002, when plaintiff was 13 years of age, Mark Chamberlain, Ph.D., completed an evaluation at Northeastern Counseling Center (Tr. at 212-217). He administered the Wechsler Intelligence Scale for Children, Third Edition (WISC-III), Achenbach Child

Behavior Checklist (CBCL), Attention-Deficit Disorder Scale (ADDES), Minnesota Multiphasic Personality Inventory - Adolescent (MMPI-A), and a Children's Sentence Completion Form. He also reviewed plaintiff's records. Plaintiff's mother had complained that plaintiff was acting younger than her age; suffered from social rejection and withdrawal; constantly picked fights with her younger brother; had low self esteem, some suicidal thinking, and symptoms of depression; and often failed to listen and follow verbal instructions. Plaintiff's older brother was living in a residential treatment center "for his mental handicap".

Plaintiff's mother reported no developmental difficulties. Plaintiff was on no medication at the time.

Plaintiff initially asked how long the interview was going to take "because she was missing a volleyball tournament at her school which she was excited about."

> She scored much better on the coding subtest, which measures one's capacity to do simple tasks quickly, while her capacity to search out and process more complicated information were [sic] more impaired. In fact, her lowest score was on the picture completion subtest, which is a measure of the capacity to search patterns and identify problems visually - she scored just worse than a typical seven-year-old on this subtest. On the picture arrangement subtest, which taps, among other things, the individual's ability to recognize social cues, Monique responded as well as the average an [sic] eight-year-old. By contrast, the information subtest was her highest score among the verbal subtests, indicating that her general fund of knowledge is close to average for her age.

Plaintiff's verbal IQ was 81, her performance IQ was 65, and her full scale IQ was 71.

> Monique's behavior is perceived to be much more problematic at home by her mother than at school by her teachers, indicating that most of her emotional struggles are expressed in the home environment. . . . [H]er teacher noted much fewer difficulties than her mother did, [however] she did endorse that Monique has difficulty listing [sic] to what other students are saying, maintaining attention to important sounds in her immediate environment such as the teacher's directions, the public address system, etc., and difficulty listening to and following verbal directions. She also noted that Monique often fails to complete and return homework assignments. . . .

> This client's pattern of responses on the MPI were consistent with patterns shown by adolescents who worry and are overly anxious. Monique . . . may think about suicide in response to the problems she has being around others. . . . She appears to have

limited expectations of success in school and may not be very interested or invested in succeeding. She may feel weak, unattractive, and uncoordinated.

Dr. Chamberlain assessed dysthymic disorder, attention-deficit/hyperactivity disorder predominantly inattentive type, borderline intellectual functioning, difficulty dealing with social situations (making friends), academic difficulties, family conflict. Her current GAF was 55, past GAF was 60.

> SUMMARY AND RECOMMENDATIONS: . . . Her teachers at school seem to see her as a decent citizen, which probably means that Monique is bottling up her feelings about these struggles in order not to become even more of an outcast. She may be working very hard to restrain her impulsive responses when she's in public.

Dr. Chamberlain recommended evaluation by a psychiatrist to "further rule out other diagnoses that might account for her social difficulties, withdrawal and mistrust."

On March 24, 2007, plaintiff, age 17, was admitted to Research Psychiatric Hospital due to "suicidal gesture by overdose" (Tr. at 444-445). "She is admitted following ingestion of a small amount of Vistaril [treats anxiety], Wellbutrin [antidepressant], Skelaxin [muscle relaxer], and Lunesta [sleep aid]. She states that she has done this on a few occasions previously. She denies that she was trying to kill herself, but states that she was trying to help herself feel better." Plaintiff was given Wellbutrin, Trileptal [anticonvulsant] and Lunesta. "She reported significant improvement in her sleep, in her mood, and her overall functioning. She reported resolution of any suicidal thoughts and decrease in her anxiety." She was assessed with bipolar disorder not otherwise specified and anxiety disorder not otherwise specified. She was discharged in stable condition on March 28, 2007, with a fair prognosis.

On August 18, 2008 (in connection with plaintiff's previous application for disability benefits), Keith Allen, Ph.D., completed a Psychiatric Review Technique finding that plaintiff's mental impairment (depression and personality disorders - but not mental retardation or autism) was severe but was not expected to last 12 months (Tr. at 459-473). He found that

plaintiff had mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace. In support of his findings, Dr. Allen wrote in part as follows:

> CO noted cl had no problems with understanding, coherency, concentrating, . . . very coherent and able to provide dates and answer questions, stated mother and brother on disability. She reports being seen for counseling, but not prescribed any psychotropic medication. . . .

> Comp Mental Health - 8/9/07 continued to describe a conflicted picture of her 'agoraphobia', however reported having a great 18th birthday last week with going to the mall, out to eat and miniature golfing and didn't mention any anxiety issues associated with these activities - secondary gain noted. . . Cl reported feeling overwhelmed by exposure to other people in crowds and limited in her ability to look for or keep a job. . . . Cl's mother reports cl . . . is able to drive (has a permit so mother has to be with her when she drives), shops with her mother, is able to manage own finances, goes to store/game/church several times a week with others. As noted above, cl reports not wanting to go out alone, but case file notes cl has developed a boyfriend relationship since moving here, planned to marry him for awhile, and counselor noted probable secondary gain from her reported problems. Cl has just returned to counseling. . . . With treatment compliance cl should be capable of performing at least less demanding tasks.

On June 20, 2009, plaintiff (age 19) saw Barbara Larson, a nurse practitioner at Truman Medical Center, with a chief complaint of, "I guess my impulsiveness." (Tr. at 220-232, 243-255). Plaintiff had been brought to the hospital after a suicide attempt which resulted from an argument with her boyfriend. Plaintiff had taken an overdose of Lunesta. "She took 4 Lunesta tablets to go to sleep. She denies suicidal ideations, however, her boyfriend wrote an affidavit reporting that she made a comment to him that maybe if she were dead, everybody would be better off. At that time they brought her to the emergency room. The patient denies suicidal or homicidal ideations or auditory or visual hallucinations. She minimizes the fact that she took an increased dosage of medications. She reports that she had already talked to her therapist that day prior to the argument for doing what she did and continued to take more medication than was prescribed that evening."

Plaintiff said that her family had moved from Utah to Missouri after she completed 11th grade. When she learned she would not have enough credits to graduate, she took the test to get a GED. "She reports that she has a charge of assault for throwing wrapping paper at her mom's boyfriend". Urine drug screen upon admission was positive for marijuana; however, plaintiff denied that she ever tried drugs including marijuana. She was alert and oriented with normal speech, organized thought process, intact memory, good attention, good concentration. "Fund of knowledge and estimated intelligence are average." Plaintiff was assessed with mood disorder not otherwise specified and cannabis abuse. Her dose of Celexa (antidepressant) was increased.

By the next day, she was noted to be cooperative throughout her assessment. Her thought processes remained logical. Plaintiff said she made a statement to her boyfriend, "maybe you would be better off without me," because they had argued and he threatened to leave her. He mistook her statement for a suicide threat. Plaintiff said she occasionally went to food banks to get food for her family. She drank alcohol to excess in the past but had not used alcohol in several months. She used methamphetamine about three months earlier but she stopped using it because she did not like the way it made her feel. Plaintiff lost her last job at McDonald's due to being sick. Plaintiff reported financial problems and said she and her family were being kicked out of the duplex where they were living due to having too many people living there. They had already arranged for new housing, however. Plaintiff reported having a very supportive friend, a supportive boyfriend, and a somewhat supportive mother. Her father was abusing alcohol and drugs.

Plaintiff was discharged on June 23, 2009. "Over the weekend she did well. She participated in groups. Slept well. She was able to talk to her boyfriend and her mom and felt much better and denied suicidal or homicidal ideations". She was casually groomed and

dressed. She was noted to be cooperative with normal mood and affect, normal speech, organized thought process. She was alert and fully oriented, was future oriented with focused thought content. Memory was intact. Attention and concentration were good. "Fund of knowledge and estimated intelligence, average." Her discharge diagnoses were adjustment disorder with dysphoric mood and cannabis abuse. Her GAF was 65. Axis IV stressors were "financial, unemployment, social support stressors." She was given prescriptions for Celexa, 30 mg once a day, Ambien for insomnia, 10 mg once at bedtime.

About 14 months later, on August 3, 2010, plaintiff was seen at Comprehensive Mental Health Services ("CMHS") by Christine Felitsky, Ph.D., for an hour (Tr. at 178-184). She said she had become depressed during her pregnancy and this had persisted. She reported feeling stress over lack of money and a new baby. Plaintiff was 21 and her fiancé was 37; he was noted to do most of the talking during this appointment which frustrated plaintiff. Plaintiff's boyfriend's "two children just moved in with her as well. She resents this, has no time for herself." Plaintiff explained that the two children are her fiancé's from another relationship. Plaintiff was only taking over-the-counter Tylenol for headaches at the time of this appointment. She reported no history of suicidal ideation, no history of homicidal ideation. Her risk assessment score was "low." She reported a normal childhood with no significant issues. Plaintiff reported she finished 11th grade and then got a GED. "Cl[ient] has depression/mood swings since birth of baby 6 months ago. Cl[ient] also unhappy w/his children moving in w/them." Dr. Felitsky noted that plaintiff's appearance was neat, clean and appropriate. She was isolative and withdrawn with a depressed/sad mood and affect. Her thinking style was noted to be normal. Her thought content was normal. Her intellectual functioning was noted to be average with no impairment observed. Insight and judgment were

normal.  No other symptoms were marked.  Dr. Felitsky assessed major depressive disorder with a GAF of 50.

On September 14, 2010, plaintiff returned to see Dr. Felitsky (Tr. at 186).  She reported that her symptoms had not improved since her last visit.  "Cl attends with her boyfriend who is 15 years her senior. Cl is now raising his two children in addition to her baby.  This is an ongoing source of depression for Cl.  Cl feels overwhelmed by the responsibility.  Neither of them work at present time.  Cl would like to start an antidepressant and feels her anxiety is also an issue."

On September 15, 2010, plaintiff applied for disability benefits.

On September 30, 2010, plaintiff returned to see Dr. Felitsky (Tr. at 191).  Plaintiff reported that her symptoms had not improved since her last visit.  "Cl attends with her boyfriend.  Both are attempting to get disability insurance as a result of coming to CMHS.  Discussed that they are young and able to work.  Discussed that this is not necessarily going to provide a means to SSI benefits.  Cl seemed frustrated."

On October 19, 2010, plaintiff saw Dr. Felitsky and said she was doing about the same (Tr. at 192).  "Still managing all the children. Cl has issues with boyfriend regarding his strict nature and OCD. . . . Cl still thinking she is unable to work or function in society. Cl going to apply for disability.  Cl explains that pain is an ongoing issue as well."

On October 23, 2010, plaintiff saw Nallu Reddy, M.D., and denied suicidal ideation (Tr. at 193-195).  Her chief complaint was, "I stopped seeing counseling." Plaintiff reported that her depression was "coming back" and she wanted to "be back on medication and therapy."  During this visit, plaintiff reported that her depression was going on as far back as she could remember, and she also reported anger problems on this visit.  Plaintiff said her inpatient hospitalization in June 2009 was impulsive after fighting with her boyfriend.  She

used marijuana in 2008. Dr. Reddy observed that plaintiff was alert and oriented times three. Her insight and judgment were described as good. Dr. Reddy assessed bipolar disorder, depressed type; financial stressors, health stressors, and occupational problems; and a GAF of 38. Dr. Reddy prescribed Wellbutrin (antidepressant), Ativan (anti-anxiety medication, which Dr. Reddy specified was for "short term"), and Abilify (antipsychotic), and an anxiety group was recommended.

On November 6, 2010, J. Edd Bucklew, Ph.D., completed a Psychiatric Review Technique (Tr. at 196-207). Dr. Bucklew found that plaintiff's mental condition resulted in moderate[2] restriction of activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace. In support of those findings, Dr. Bucklew noted that plaintiff's alleged onset date was August 13, 2006, and that she had a prior denial on August 18, 2008. He cited plaintiff's daily activities; observations that plaintiff had no problems with talking, answering, coherency, concentrating or understanding; medical records which show improvement with medication and voluntarily ceasing treatment; and her ability to care for three children without constant social interaction or unusual supervision.

That same day Dr. Bucklew prepared a Mental Residual Functional Capacity Assessment (Tr. at 208-210). He found that plaintiff is not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

---

[2]Both "mild" and "moderate" are checked, but I will assume the highest level of impairment is the one intended (Tr. at 204).

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

He found that plaintiff is moderately limited in the following:

- The ability to sustain an ordinary routine without special supervision

- The ability to interact appropriately with the general public

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

On November 9, 2010, plaintiff's application for disability benefits was denied.

On November 30, 2010, plaintiff saw Christine Felitsky, Ph.D., at CMHS (Tr. at 276).

"Cl is doing well today. . . . Cl has appeal[ed] the decision of the disability office and hired atty.

Cl has not been attending anxiety group and refuses to do so. Discussed her reasons and how it may benefit her."

On December 3, 2010, plaintiff saw Nallu Reddy, M.D., at CMHS (Tr. at 275). Plaintiff reported some improvement but that she was still having "little mood swings." Plaintiff said she wanted to increase her Abilify (antipsychotic). Plaintiff reported trouble attending appointments because her mom moved out of the house. During a mental status exam, Dr. Reddy observed improved mood with appropriate affect. She had good insight, good judgment. Dr. Reddy discontinued Abilify (antipsychotic), prescribed Wellbutrin (antidepressant) and Ativan (anti-anxiety), and told plaintiff to return in two months.

On January 24, 2011, plaintiff saw Florence Oni, ARNP, at CMHS for a follow up (Tr. at 274). Plaintiff reported feeling overwhelmed with having to care for her "step children," ages 4 and 5. Plaintiff's mood was observed to be slightly depressed, memory was intact. She denied thoughts of harm to herself or others. Plaintiff's Wellbutrin (antidepressant) dose was increased, her Ativan (anti-anxiety) was decreased, she was told to discontinue Abilify (although Dr. Reddy had discontinued that medication almost two months earlier despite plaintiff's request to increase her dose) as she had developed diabetes, and she prescribed Vistaril (anti-anxiety) and Lamictal (mood stabilizer).

On March 23, 2011, plaintiff saw Florence Oni, ARNP, at CMHS for a follow up (Tr. at 273). She reported "mild residual symptoms of depression. Mood swings seems to be her biggest concern today." Plaintiff was observed to be slightly depressed with a pleasant affect. Memory was intact. She denied suicidal thoughts. Her dose of Lamictal (mood stabilizer) was increased.

On April 12, 2011, plaintiff saw Christine Felitsky, Ph.D. (Tr. at 272). "Cl is doing well today. Cl continues to manage children with the help of her boy friend who does not work.

Both clients are trying to get disability, discussed with her the possibility that she will be denied benefits and then what will her plan be. Cl has no plan but to have another child. Cl is doing well, attends only for purpose of court case and disability case."

On May 18, 2011, plaintiff saw Florence Oni, APRN, at CMHS for a follow up (Tr. at 271). Plaintiff reported increased depression and mood swings, occasional insomnia and crying spells, and anger. Plaintiff said she had thoughts of self harm a week ago and "she made a superficial scratch mark on her right forearm. She denies those thoughts today." Plaintiff's mood was slightly depressed, memory was intact, she was well groomed and well dressed. Her Lamictal (mood stabilizer) was increased and she was told to continue with her other medications. "I told her she may take an additional two capsules of Vistaril [anti-anxiety] q.h.s. [at bedtime] to help her with insomnia."

On June 20, 2011, plaintiff saw Christine Felitsky, Ph.D. (Tr. at 270). "Cl doing well today. . . . Cl continues to manage children with the help of her boyfriend who does not work Both clients are trying to get disability. Discussed with her the possibility that she will be denied benefits and then what will her plan be."

On July 26, 2011, plaintiff saw Christine Felitsky, Ph.D. (Tr. at 269). She was noted to be doing "fair" today. "Cl has DFS issues pending. Cl moved to mom's house during the investigation. Cls have court today. . . . Both clients [plaintiff and her boyfriend] are trying to get disability, discussed with her the possibility that she will be denied benefits and then what will her plan be. Cl has no plan but to have another child. Cl is doing well, attends only for purpose of court case and disability case."

On August 1, 2011, plaintiff saw Florence Oni, APRN, at CMHS (Tr. at 268). Plaintiff reported depression, crying episodes, insomnia, anger, mood swings and anxiety. Plaintiff had stopped taking Lamictal (mood stabilizer) about 5 or 6 weeks earlier because she did not think

it was working. "She would like to get on another mood stabilizer." Plaintiff was observed to be casually dressed with clean appearance. Her mood was slightly depressed with congruent affect. Memory was intact. She was assessed with bipolar disorder depressed type and a GAF of 38. Although plaintiff had said she stopped taking Lamictal a month and a half earlier, it was still listed as a current medication on this form. Ms. Oni prescribed Neurontin (anticonvulsant), she increased plaintiff's dose of Vistaril (anti-anxiety), she increased her dose of Wellbutrin (antidepressant), and she told her to return in a month.

On August 18, 2011, plaintiff was admitted to Two Rivers Psychiatric Hospital for suicidal ideation with no plan due to "break up with baby daddy, pt. living with mother." (Tr. at 278-343, 356-363, 365-372, 406-416). Plaintiff was observed to be neatly groomed, calm and cooperative (Tr. at 356). Memory was normal, abstract reasoning was normal, intelligence was average (Tr. at 305). She denied being diabetic or being on medications for diabetes; however, metformin was on her medication list (Tr. at 325-326). Her blood sugar was 92, which is normal (Tr. at 299). During a learning assessment, it was noted that plaintiff is "eager to learn" and learns best by listening and reading as opposed to demonstration or participation (Tr. at 284, 360). She reported "no learning barriers" (Tr. at 284). Plaintiff reported no leisure or social outlets because, "I don't have a lot of time" (Tr. at 288). However she reported that she enjoys reading (Tr. at 288). Plaintiff reported three previous suicide attempts including one during which she cut her wrist with a razor (Tr. at 289, 365). She said she had just moved back in with her mother the previous month (Tr. at 289). She was receiving Temporary Assistance for Needy Families (Tr. at 290).

Plaintiff "noted a long-term diagnosis of bipolar mood disorder and posttraumatic stress disorder." (Tr. at 397). She said she attempted suicide in May 2011 "by cutting her wrist" (I point out that on May 18, 2011, she was noted by CMHS to have a "superficial scratch mark

on her right forearm") and in 2006 by overdosing on sleeping medication (Tr. at 403, 418). "Reportedly, she was admitted at Research Psychiatric Hospital in June of 2009. Also has been admitted at Truman Lakewood due to an overdose of Lunesta as well." (Tr. at 403, 418). Plaintiff reported that in 2008 she used marijuana on a daily basis for one year (Tr. at 403). Although plaintiff had been noted by others to be neatly groomed, Asim Ulusarac, M.D., described her as somewhat disheveled (Tr. at 404, 419). Dr. Ulusarac found that plaintiff's concentration and attention span were intact (Tr. at 404). Immediate, short-term and long-term memory were intact (Tr. at 404). "Intelligence is average evidenced by vocabulary and fund of knowledge. Activities of daily living and motor activity fair to impaired." No further explanation of that finding was provided (Tr. at 404). Dr. Ulusarac assessed major depressive disorder, possible post traumatic stress disorder, and mixed personality disorder not otherwise specified.

A therapist met with plaintiff and her mother to discuss options and recommendations for continued treatment. "She wants PTS services through New Directions. At this time, she is not interested in PHP or IOP [partial hospitalization program or intensive outpatient program]." (Tr. at 321).

She spent the first day resting (Tr. at 312). The next day she was observed to be calm, alert and oriented (Tr. at 314). She denied suicidal ideation (Tr. at 314). Plaintiff reported that her boyfriend was very controlling and emotionally abusive. "They have recently broken up. They often break up and then get back together."

The next day, August 20, 2011, she was observed to be alert and oriented times four (Tr. at 316). She denied any suicidal ideation (Tr. at 316). She said she was depressed about not getting to see her daughter while at Two Rivers (Tr. at 316).

The next day, August 21, 2011, plaintiff was observed to be fully oriented, calm, cooperative, and compliant with medications (Tr. at 318). She denied suicidal ideation, panic attacks, anxiety (Tr. at 318). "Pt is WNL [within normal limits]." (Tr. at 318).

Plaintiff was discharged from Two Rivers on August 22, 2011, and was put in the partial hospitalization program (Tr. at 322-323). Her primary diagnosis was bipolar mood disorder (Tr. at 330). She reported that her mood was "good and even"; her affect was observed to be "bright and euthymic." Plaintiff was eating and sleeping well and denied any racing thoughts. As far as her anxiety, she said, "the Geodon [antipsychotic] definitely helped." She denied suicidal ideation. (Tr. at 397).

Plaintiff was scheduled to be in the partial hospitalization program following her discharge from inpatient treatment, with transportation provided for her (Tr. at 322). She was to attend five days per week for 6 1/2 hours per day for 5 to 10 days (Tr. at 381). On her first day, her chief complaint was listed as, "I'm here for the day program." "Monique states that she moved in with her mother. She states that her boyfriend is unemployed and he uses her money to buy K2 [synthetic marijuana]." (Tr. at 364).

While plaintiff was in inpatient, Brian Barash, M.D., had discontinued her Neurontin (anticonvulsant) and stabilized her on Xanax (anti-anxiety), Pristiq (treats depression) and Geodon (antipsychotic) (Tr. at 347). Plaintiff reported, "I definitely think I'm doing better, but I could feel the anxiety come on a little bit more after I went home." (Tr. at 353, 421). When plaintiff went home, she was unable to fill her prescription for Geodon because she did not have prior authorization (Tr. at 353). Her sleep and appetite were normal. "I definitely think my mood has improved." Plaintiff denied any alcohol or drug abuse. Plaintiff reported continued stress with her boyfriend, indicating that she did not know whether they were going to get back together. She was living with her mother and reported that the situation was going

OK.  On exam, Michael Young, M.D., observed that plaintiff was "pleasant, polite, cooperative, well-groomed with good eye contact.  Speech was regular rate and rhythm and goal directed.  Her mood was 'more stressed out today,' and her affect did seem to be somewhat more anxious and irritable due to not being on the Geodon at this time.  She currently denied being suicidal or homicidal.  She denied any auditory or visual hallucinations.  No thought blocking or paranoia was noted.  She was alert and oriented to person, place, and time.  She was attentive with the interview and showed no confusion.  She had good immediate recall. . . .  Her intelligence seems to be average by fund of knowledge as well as by vocabulary.  Insight and judgment are currently suboptimal, but improved." (Tr. at 354, 375-376).  Dr. Young indicated he would have the nurse call to authorize Geodon so plaintiff could start taking that again.

On August 24, 2011, plaintiff attended her treatment at Two Rivers (Tr. at 390).  She reported her a mood a 6 out of 10 and said she had been "a little bit depressed".  She said she had a panic attack and her anxiety was very high because "some people don't support my treatment."  She indicated that her medications were treating her symptoms, and that she had finally gotten her Geodon.  She listed her concerns as "warrant payment & custody filing".  Triggers were listed as "talking to my ex, toddler getting into everything!"

On August 25, 2011, plaintiff attended her treatment at Two Rivers (Tr. at 392).  She reported her mood a 7 out of 10.  She described herself as "a little bit depressed, irritable".  She was asked to list her concerns; she wrote, "still have financial concerns."  Asked to identify any triggers to her symptoms, she said, "My daughter being angry and getting into everything!"

On August 26, 2011, plaintiff attended her treatment at Two Rivers (Tr. at 394).  She described her symptoms as follows:  "little bit anxious".  She said that her doctor had prescribed Xanax but her pharmacy would not let her get it.  She had no relationship concerns

- the only concern noted was "financial." Triggers were noted to be, "financial issues, worried about my daughter & missing her, she is at her dad's." Plaintiff reported that she continued to have relationship issues with her boyfriend (Tr. at 378). She was observed to have a normal appearance, she had cooperative behavior, she was fully oriented, her speech was normal, her affect was normal, her thought processes were normal. On this medical form, a box was checked indicating, "requires assistance" with activities of daily living; however, although the form requested a description, that was left blank. Attention/concentration were noted to be "impaired" but again with no description. The psychiatrist checked the boxes indicating her condition was likely to improve with further inpatient treatment and discharge at this time would place the patient at foreseeable risk.

On August 29, 2011, plaintiff did not show up for her treatment at Two Rivers (Tr. at 379). On August 30, 2011, she failed to show up for her treatment at Two Rivers (Tr. at 379). Because she did not show up for two days, she was administratively discharged in stable condition on August 30, 2011, even though her psychiatrist had noted on her last day that "discharge at this time would place the patient at foreseeable risk." (Tr. at 347-348). On August 31, 2011, a nurse called plaintiff to talk to her about her absences (Tr. at 380). Plaintiff said her daughter was sick, but she denied suicidal ideation and said she would follow up with her doctor and therapist.

On September 20, 2011, plaintiff saw Linda Kurian, M.S., for individual therapy (Tr. at 447-454). Plaintiff said she had abnormal suicidal thoughts, depression and anxiety "which made it extremely difficult to leave her home." Plaintiff reported agitation, excessive worry, fatigue, irritability, restlessness, poor concentration, sleep disturbance, tension, dizziness, difficulty breathing, anhedonia, and insomnia, among other symptoms. Her grooming and hygiene were observed to be good. Her dress was appropriate. She was described as open and

cooperative with good self care. "Ability to and performance of daily living skills including personal grooming including level of independence and need for prompts/assistance: Good." Her self direction and decision-making skills were impaired. Plaintiff reported feeling worthless due to her inability to work or perform simple daily chores. "Ms. Jones appeared to struggle answering the therapist questions as if she did not understand the question or did not know how to answer." Her mood was depressed, affect blunted, impulse control poor, thought process impaired, memory impaired, judgment impaired, insight impaired. Although plaintiff had in the past reported that her older brother was in state custody due to his abusive nature, she told Ms. Kurian that her older brother was "in state custody 'because of mental retardation.'" Plaintiff told Ms. Kurian that she had gone to jail in 2008 for throwing wrapping paper at her mother's boyfriend, and the wrapping paper "had something on it." She said that the police gave her mother the choice of sending her boyfriend to jail or plaintiff to jail, and her mother had chosen to send her to jail. Plaintiff said that according to her mother, she had delays in meeting developmental milestones (although plaintiff's mother had actually reported that plaintiff had no such delays (Tr. at 212-217)).

Based on the symptoms reported by plaintiff, Ms. Kurian assessed panic disorder without agoraphobia and post traumatic stress disorder.

On September 25, 2011, plaintiff saw Michael Young, M.D. (Tr. at 435-437). Plaintiff said her mood was stable but she was more anxious. "Back with boyfriend (who has been abusive in the past)." She reported no medication side effects, normal sleep. Her appearance was normal, behavior was normal, attention was normal, concentration was normal, eye contact was good, speech was normal, "intelligence appears average", memory was normal, socialization was normal. Despite that fully normal exam with the exception of an anxious mood, plaintiff's diagnoses were listed as bipolar disorder not otherwise specified,

uncontrolled; generalized anxiety disorder, uncontrolled; chronic posttraumatic stress disorder, uncontrolled. Dr. Young increased plaintiff's Xanax (anti-anxiety) dose.

The next day, on September 26, 2011, plaintiff saw Shelby Markum, licensed clinical social worker (Tr. at 438-441). Plaintiff said that Comprehensive Mental Health Services had diagnosed her with agoraphobia, post-traumatic stress disorder, obsessive compulsive disorder, and bipolar mood disorder. Plaintiff said that CMHS had been treating her since she was 14 years of age; although earlier she said she had moved to Missouri after completing 11th grade in Utah. Plaintiff was observed to be well groomed with good hygiene. Her memory was normal. She was alert and fully oriented. Her attention was normal. Her concentration was normal. Her impulse control was normal. Psychomotor activity was normal. Eye contact was normal. Attitude was pleasant and cooperative. Affect was euthymic. Sleep was normal. Speech was normal. Thought process was normal. Thought content was normal. Insight was poor, judgment was fair. Again, despite the normal examination, plaintiff was diagnosed with bipolar disorder not otherwise specified, uncontrolled; generalized anxiety disorder, uncontrolled; and chronic post traumatic stress disorder, uncontrolled.

Plaintiff's administrative hearing notice is dated October 4, 2011.

On October 13, 2011, plaintiff saw Linda Kurian, M.S. (Tr. at 455). Plaintiff reported that a few days ago she had "attempted to overdose on Xanax." There is no assessment or treatment included in this record.

On October 14, 2011, plaintiff saw Asim Ulusarac, M.D. (Tr. at 431-433). Plaintiff reported going to Two Rivers Psychiatric Hospital the night before and was evaluated. "She states 10 days ago she was having an argument with her boyfriend and impulsively took 5 tablets of Xanax 2 mg strength. She states her intent was not to kill herself. She denies having current suicidal ideation/homicidal ideation." She reported no side effects with her

medication.  Sleep was normal, appearance was normal, behavior was normal, attention was normal, concentration was normal, eye contact with good, speech was normal, mood was anxious.  "Intelligence appears average."  Her immediate, short-term and long-term memory was normal.  She was told to stop taking Xanax because of her abuse of that medication and to start taking BuSpar (anti-anxiety but not a controlled substance like benzodiazepines like Xanax) instead.

On October 20, 2011, plaintiff saw Linda Kurian, M.S. (Tr. at 455).  Plaintiff reported that she had gone to Two Rivers for an evaluation and then they sent her home.  She said that her Xanax "remained the same"; however, her Xanax had actually been discontinued due to her abuse of that medication.  Ms. Kurian included no observations, no assessment, and no treatment in this record.

On October 31, 2011, plaintiff saw Michael Young, M.D. (Tr. at 424-427).  She reported that her mood was doing "much better, more stable, even, not depressed."  Plaintiff reported significant issues with anxiety and agreed to restart Xanax which had been prescribed when she was discharged from Two Rivers the end of August.  "Pt understands that medication is to be taken as directed, any further overuse of medication will lead to no further benzodiazepine scripts."  She reported no side effects from medication.  Her sleep was normal, appearance and behavior were normal, attention and concentration were normal, eye contact was good.  Speech was normal, suicidal ideation was denied, no psychosis was alleged or observed, mood was good, affect was euthymic and full.  Anxiety was "within normal limits".  Her intelligence "appears average".  Memory was intact.  Socialization was normal.  All of her diagnoses (bipolar disorder not otherwise specified, generalized anxiety disorder, chronic posttraumatic stress disorder, and mood disorder) were noted to be improving.  Her axis IV stressors were noted to be "severe."  Plaintiff was told to stop taking BuSpar (but the record

indicates that she had already stopped it) and to restart Xanax. Her condition was noted to be stable.

That same day plaintiff saw Shelby Markum, a licensed clinical social worker (Tr. at 428-429). Plaintiff reported she was very worried about her boyfriend because his children, ages 4 and 5, reported to DFS that plaintiff's boyfriend had abused them and she was afraid he would get in trouble. She reported "doing well overall." Ms. Markum noted that plaintiff was not working. "I just sit around all day, I get bored. I've thought about getting a job." Ms. Markum "encouraged pt to find even a part-time job to keep her active and busy." Mental status examination and observations were normal.

On December 3, 2011, plaintiff saw Linda Kurian, M.S., and returned a questionnaire she had completed to screen her for Asperger's syndrome (Tr. at 455-458). Ms. Kurian wrote, "in light of behaviors described and noted, the therapist has changed provisional diagnosis to Autistic Disorder, Panic Disorder without Agoraphobia, and post traumatic stress disorder." Her recommendation was to continue therapy.

On December 8, 2011, plaintiff's administrative hearing was held. On January 24, 2012, the ALJ entered her opinion finding plaintiff not disabled.

The following records were submitted to the Appeals Council.

On February 7, 2012, plaintiff was evaluated at Pathways (Tr. at 481-487). Plaintiff reported anxiety, bipolar mood disorder, depression, panic attacks with agoraphobia, "very forgetful always been that way." Plaintiff reported that she had a GED. "[L]earning disability in resource/special ed up through 8th grade, always had a hard time learning, now still hard time with math." She reported a difficulty concentrating: "all the time cannot even sit and watch TV". Plaintiff said that she cannot save money, "has spending sprees 'I have money I have to go spend it.'" Plaintiff said she had attention deficit disorder as a child. She said she

had been having panic attacks since 8th grade, especially if she is in stores around too many people. Plaintiff last used marijuana in 2011, she last used methamphetamine in 2009 but "she craves it." Based on these allegations, plaintiff was diagnosed with bipolar disorder, panic disorder with agoraphobia, and post traumatic stress disorder. No treatment or recommendations were noted.

On March 21, 2012, plaintiff saw Umonoibalo Ehimare, M.D., for a psychiatric evaluation (Tr. at 491-495). Plaintiff said she had recently moved to Lexington and needed a psychiatrist so she could continue her medication. Plaintiff said she was having panic attacks 2 to 3 times a week, and that her agoraphobia "really spikes" her anxiety if she goes out in public. Plaintiff reported an improvement in her mood swings as a result of medication she had been prescribed the month before. She reported last having suicidal thoughts in January 2012 after a fight with her boyfriend's mother (with whom plaintiff was living). Plaintiff reported auditory hallucinations. She also reported paranoia in the form of believing other people and the government were watching her through the television. Plaintiff reported memory problems since falling off a horse and passing out at age 13. Plaintiff reported drinking to the point of throwing up almost daily from age 16 to age 19. She last consumed alcohol the month before this appointment. She reported having last used marijuana in May 2009, although the month before at Pathways she reported having used marijuana as recently as 2011. Plaintiff reported that she had not seen Linda Kurian, her in-home therapist, "in a while". Plaintiff reported too many past suicide attempts to count. She said she left her job at McDonald's due to having panic attacks at work. On exam plaintiff was observed to be alert and fully oriented, calm, cooperative. She had good eye contact, good rapport, normal speech, fair insight and judgment. She was assessed with bipolar disorder, panic disorder with agoraphobia, post traumatic stress disorder, rule out schizoaffective disorder, and rule out

cognitive disorder not otherwise specified.  Dr. Ehimare told plaintiff to increase her Xanax and he added Abilify (antipsychotic) to her other medications.

On April 6, 2012, plaintiff saw Michael Mitchell for her initial session of individual therapy (Tr. at 496).  He observed that plaintiff had good hygiene.  Plaintiff reported "very negative reactions to flashbacks."

On April 18, 2012, plaintiff saw Dr. Ehimare for a follow up (Tr. at 497-499).  She reported flashbacks, poor concentration, hallucinations, paranoia, racing thoughts, irritability, mood swings, memory problems, hand tremors.  Her mental status exam was normal except her affect appeared dysphoric.  Dr. Ehimare discontinued plaintiff's Abilify and told her to continue her other medications.

On April 26, 2012, plaintiff saw Michael Mitchell for individual therapy (Tr. at 500).  Plaintiff was observed to have good hygiene.  She reported depression, panic attacks, low mood, anxiety, worry, low self esteem.  She said she was exercising and was "getting fit."

On May 9, 2012, plaintiff saw Dr. Ehimare for a follow up (Tr. at 501-503).  This record appears to be word-for-word the same as the record of April 18, 2012, including a notation that the same medication with the same dose was changed "yesterday" in both records.  Dr. Ehimare prescribed Lamictal (mood stabilizer) with a plan to stop plaintiff's Lithium (treats manic episodes) after she was established on Lamictal.

On May 10, 2012, plaintiff saw Michael Mitchell for individual therapy (Tr. at 504).  She was observed to have good hygiene.

C.      *SUMMARY OF TESTIMONY*

During the December 8, 2011, hearing, plaintiff testified; and Alissa Smith, a vocational expert, testified at the request of the ALJ.

1.      **Plaintiff's testimony.**

At the time of the hearing plaintiff was 22 years of age and is currently 25 (Tr. at 57).

She is 5'6" tall and weighs 197 pounds (Tr. at 57).  She is not married but has a child who, at

the time of the hearing, was 20 months old (Tr. at 57).  Plaintiff dropped out of school after

11th grade and got a GED (Tr. at 57).  She is able to read and write in English (Tr. at 5).  In

school plaintiff was in "resource" which is like special education classes (Tr. at 60-61).  A lot

of times plaintiff has trouble "making out the words and sounding them out or understanding"

what she is reading (Tr. at 61).  She can do very simple math (Tr. at 61).  It takes her "a little

bit" but she can make change (Tr. at 61).  She cannot manage a bank account; she had one

before and she was overdrawn (Tr. at 61).

Plaintiff last worked at McDonald's in 2009 for about four months part time (Tr. at 58,

62).  She mostly cleaned off the tables and worked the drive-through (Tr. at 58).  It was a busy

McDonald's (Tr. at 58).  Plaintiff worked for 4 or 5 hours each day, about 3 or 4 days a week

(Tr. at 62).  She left that job because, "it was too hard for me." (Tr. at 58).  Being around all

the people made her very anxious (Tr. at 62).  When she was 16, plaintiff worked at a bakery

in Utah washing dishes and cleaning bathrooms (Tr. at 58).  She did that job for a couple

months (Tr. at 58).  She left that job because it caused her too much anxiety (Tr. at 59).

Plaintiff is unable to work because she has panic attacks 2 or 3 times a week (Tr. at 59,

65).  The panic attacks last about 5 minutes each (Tr. at 66).  She has panic attacks at home but

especially when she goes out in public (Tr. at 66).  She has no physical problems (Tr. at 59).

She takes medication which causes her "mouth and . . . facial movements [to be] all contorted

and weird." (Tr. at 59).  She began seeing Dr. Young 3 or 4 months before the hearing, and

before that she received treatment from Comprehensive Mental Health for about 5 years (Tr. at

63).  Dr. Young was plaintiff's doctor at Two Rivers and she liked him so she decided to start

going to him for treatment (Tr. at 63). Plaintiff was hospitalized at Two Rivers twice during August 2011, once for 4 or 5 days and the second time for 3 or 4 days and on the second time she would only be at the hospital during the day and went home at night (Tr. at 64). Plaintiff was not having suicidal thoughts at the time of the hearing (Tr. at 64). However, she suffers from severe depression and mood swings in addition to severe anxiety (Tr. at 64). Despite taking medication (Xanax, Pristiq and Geodon) plaintiff continues to have panic attacks (Tr. at 65).

Plaintiff sees a therapist at a medical office and she also has a therapist who comes to her home (Tr. at 67). The home therapist had been coming weekly for the past two months (Tr. at 67). She sees the therapist at the medical office once a month (Tr. ta 67-68).

Plaintiff's racing thoughts interfere with her sleep (Tr. at 69). She is not taking any medication to help her sleep (Tr. at 69).

Plaintiff stays home most of the time trying to take care of her daughter (Tr. at 59). Her boyfriend's mother helps take care of the child by changing her, feeding her, and bathing her (Tr. at 59). Plaintiff forgets to take care of her daughter a lot of the time (Tr. at 59). She is very forgetful and needs to be reminded to feed and change her daughter (Tr. at 68). Plaintiff has always been forgetful (Tr. at 68).

Plaintiff's boyfriend and his mother do most of the housework, but plaintiff does a little (Tr. at 59). Plaintiff's boyfriend is 38 years of age and does not work (Tr. at 60). Plaintiff and her boyfriend previously split up and she lived with her mother, but then she and her boyfriend reconciled and moved in with his mother the day before Thanksgiving (i.e., 15 days before the hearing) (Tr. at 62). Plaintiff can cook a little bit (Tr. at 69).

Plaintiff has never had a driver's license (Tr. at 60). Family members take her places she needs to go, but she does not like to leave to house (Tr. at 66). She is not able to take public

transportation because she is afraid of being around people (Tr. at 68). She does not smoke, but she drinks occasionally (Tr. at 60). Plaintiff has no friends (Tr. at 68).

## 2. Vocational expert testimony.

Vocational expert Alissa Smith testified at the request of the Administrative Law Judge. The first hypothetical involved a person who should avoid contact with the public; should have no co-workers in her work area; and is able to perform simple, repetitive tasks (Tr. at 71-72). The vocational expert testified that such a person could work as a vegetable farm worker, DOT 402.687-010, medium exertion, unskilled with an SVP of 2, with 740 in Missouri and 96,920 in the country (Tr. at 72). The person could work as a lab equipment cleaner, DOT 381.687-022, medium exertion, unskilled with an SVP of 2, with 1,100 in Missouri and 53,940 in the country (Tr. at 72). The person could work as a garment bagger, DOT 920.687-018, light exertion, unskilled with an SVP of 1, with 1,135 in Missouri and 57,000 in the country (Tr. at 72).

The second hypothetical involved a person who experiences difficulty leaving the home up to two times a month and therefore would be unable to work those days (Tr. at 73). The vocational expert testified that such a person could not work (Tr. at 73).

## V. *FINDINGS OF THE ALJ*

Administrative Law Judge Mary Ann Lunderman entered her opinion on January 24, 2012 (Tr. at 13-21).

Step one. Plaintiff has not engaged in substantial gainful activity since September 15, 2010, the day she filed her application for disability benefits (Tr. at 15).

Step two. Plaintiff suffers from bipolar mood disorder and anxiety disorder which are severe impairments (Tr. at 15).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15-17).

Step four.  Plaintiff retains the residual functional capacity to perform a full range of work at all exertional levels except she should avoid contact with the public, is limited to independent work with no co-workers in her immediate work area, and is limited to work consisting of simple repetitive tasks (Tr. at 17).  Plaintiff has no past relevant work (Tr. at 19).

Step five.  Plaintiff is capable of performing work available in significant numbers, such as garment bagger, vegetable farm worker, and lab equipment cleaner (Tr. at 20).  Therefore, plaintiff is not disabled (Tr. at 21).

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.  CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the

basis of objective medical evidence or personal observations by the ALJ.  In determining

credibility, consideration must be given to all relevant factors, including plaintiff's prior work

record and observations by third parties and treating and examining physicians relating to

such matters as plaintiff's daily activities; the duration, frequency, and intensity of the

symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of

medication; and functional restrictions.   Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.

1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the

Polaski opinion, and additionally states that the following factors should be considered:

Treatment, other than medication, the individual receives or has received for relief of pain or

other symptoms; and any measures other than treatment the individual uses or has used to

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20

minutes every hour, or sleeping on a board).

    The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of

disability are as follows:

> Inherent upon filing an application for benefits, in reports related to her disability claim
> and in testimony, the claimant has alleged that she is entirely unable to work in any
> capacity.  Specifically, the claimant alleges she is disabled due to "really high" anxiety
> with panic attacks happening 2 to 3 times a week lasting five minutes each time.  She
> also testified to medication side effects causing her to experience contorted mouth and
> facial movements and problems reading, though she also testified that she is able to
> read and write in English.
>
> After careful consideration of the evidence, I find that the claimant's medically
> determinable impairments could reasonably be expected to cause the alleged symptoms;
> however, the claimant's statements concerning the intensity, persistence and limiting
> effects of these symptoms are not credible to the extent they are inconsistent with the
> above residual functional capacity assessment.
>
> The evidence supports the above residual functional capacity, but is inconsistent with
> the allegations of the claimant.  The claimant is variously diagnosed with mood and
> anxiety disorders including bipolar disorder and posttraumatic stress disorder.
> Accommodating these conditions, the claimant is limited to independent work with
> simple repetitive tasks and no contact with the public or co-workers in her immediately
> work area.  The claimant was hospitalized August 18-22, 2011 for depression with

suicidal ideation. The claimant was noted as disheveled with mild to moderate psychomotor retardation upon admission. However, the claimant was cooperative and pleasant. The claimant's medications were administered and adjusted and the claimant had marked improvement of symptoms upon discharge. Immediately after her inpatient stay the claimant was admitted to a day program w[h]ere her medications were further monitored, adjusted and administered from August 23 through August 30, 2011. Upon discharge, the claimant was in stable condition with good response to medication. Treatment records in October 2011 note the claimant reported that her mood was much better, stable, and she did not feel depressed. She further reported that her anxiety medication "works great" and that she experienced no side effects of her medication. The fact that the claimant relayed she was much better and her medications were working great as of October 2011 highly suggests that she is capable of independent work with simple repetitive tasks and no contact with the public or co-workers in her immediate work area.

Additional treatment records from November 2010 through August 2011, prior to her brief hospitalization, note the claimant to have a slightly depressed mood with a congruent affect, but her memory is noted as intact. These mental status findings are consistent with finding that the claimant is capable of simple work. Noticeably absent from treatment records, there is no mention of any panic attacks or medication side effects as the claimant testified to at hearing. This erodes the claimant's credibility. Further eroding the claimant's credibility, the claimant reported to her treating practitioner in July and April 2011 that she was well and was seeking therapy only for purposes of her disability case.

* * * * *

Considering the subjective factors in this case pursuant to SSR 96-7p and 20 C.F.R. 404.1529 and 416.929, the claimant's allegations have been considered in terms of her activities of daily living; the location, duration and frequency of her symptoms; the type of medication and any side effects; other treatment claimant has received; any other measures the claimant has used for symptoms relief; and any other relevant factors concerning the claimant's alleged restrictions.

(Tr. at 17-19).

## 1.    *PRIOR WORK RECORD*

Plaintiff has no past relevant work, and her work history consists of a few months

working at a McDonald's, including at the drive-through. Plaintiff's allegations of an inability

to perform this job are not only inconsistent but irrelevant since that was a very customer-

based job and the ALJ limited plaintiff to no public contact and almost no contact with others.

Plaintiff told nurse Barbara Larson in June 2009 that she lost her job at McDonald's because

she had been sick. She told Dr. Ehimare (after the ALJ had rendered her opinion) that she left her job at McDonald's because she was having panic attacks at work. She testified at the administrative hearing that she left her job at McDonald's because it was too hard for her and that being around people made her anxious.

## 2. DAILY ACTIVITIES

The record shows that plaintiff took care of an infant and two young children with the help of her boyfriend. These daily activities are inconsistent with total disability. (I note that plaintiff testified her mother helped her, but the medical records reflect that she and her boyfriend cared for these children together, that both were unemployed and both were seeking disability. I further note that plaintiff's allegation that her mother helped her significantly is undermined by the fact that her mother has been found disabled).

## 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

On September 15, 2010, plaintiff met face to face with a disability interviewer who noted that plaintiff showed no difficulty with reading, understanding, coherency, concentrating, talking, answering, or writing.

Although plaintiff claims to have agoraphobia, both she and her mother reported that it takes "quite a while" for her to do her shopping because she can't decide what to buy. Additionally, the record reflects that plaintiff was able to celebrate her birthday eating out and going to the mall with friends; she reported being able to take public transportation to her medical appointments; and the one job she attempted and succeeded in getting is in customer service. All of these things are inconsistent with disabling agoraphobia.

In December 2010, plaintiff told Dr. Reddy she was having "little mood swings." In March 2011, plaintiff told Ms. Omni that she had "mild residual symptoms of depression." In August 2011 after several days in the hospital and getting back on her medication, plaintiff's

symptoms improved markedly and while still in the partial hospitalization program she described her symptoms as "a little bit anxious." On October 31, 2011, plaintiff said she was "doing well overall."

On March 21, 2012 -- after the ALJ had found plaintiff not disabled and had included the following in her order: "Noticeably absent from treatment records, there is no mention of any panic attacks" -- plaintiff reported panic attacks to a doctor for the first time.

Plaintiff sought treatment from a psychologist, Dr. Felitsky, just prior to filing her disability application, told Dr. Felitsky that she was coming to CMHS in order to get disability, and the following month stopped her counseling with Dr. Felitsky after she was told by Dr. Felitsky that she is not disabled. Plaintiff returned only after she appealed her denial of disability benefits, but she refused to attend an anxiety group as Dr. Felitsky had recommended, despite now claiming to suffer from disabling anxiety and agoraphobia.

Plaintiff was told by her psychologist, Dr. Felitsky, that she very well may be turned down for disability benefits. When asked what her "plan B" was, plaintiff said she would just have another baby. Up to that point, the stress of caring for her own child and her boyfriend's two children had allegedly been the major cause of anxiety in her life; however, her plan to have another baby if disability benefits were denied casts serious doubt on her credibility.

## 4.  *PRECIPITATING AND AGGRAVATING FACTORS*

Plaintiff argued with her boyfriend and he threatened to leave her, prompting her to take too many Lunesta and she wound up at Truman Medical Center in June 2009. She tested positive for marijuana on admission and said she had used methamphetamine three months earlier. Financial stressors and unemployment were noted as Axis IV findings.

In August 2010 plaintiff sought counseling for the stress involved in taking care of her own infant and her boyfriend's two children.

In September 2010 plaintiff said she was overwhelmed by the responsibility of taking care of her own infant as well as her boyfriend's two children. The following day she applied for disability benefits, and during her next appointment she said she and her boyfriend were trying to get disability benefits by seeking treatment through CMHS.

In October 2010, financial stressors and occupational problems were listed in Dr. Reddy's diagnosis.

In January 2011, plaintiff reported that she was overwhelmed by the responsibility of caring for her boyfriend's two children, ages 4 and 5.

In August 2011, plaintiff was admitted to Two Rivers Psychiatric Hospital after a break-up with her boyfriend. Once she went into the partial hospitalization program, she noted that her stressors were "warrant payment & custody filing" and she complained that her daughter was getting into everything. The next day when she was asked to identify her concerns, she noted only "financial concerns," and her triggers included only her daughter getting into everything. On August 26, 2011, her concerns and triggers were noted to be "financial issues."

In October 2011, plaintiff took too many Xanax tablets after an argument with her boyfriend.

In March 2012, plaintiff said she had suicidal thoughts a couple months earlier after having a fight with her boyfriend's mother (with whom plaintiff was living).

The precipitating factors in these medical records consist of plaintiff's arguments with her boyfriend and family members, the responsibility of caring for three children, and not having enough money. These factors are not related to her medically-determinable impairments or her ability to work and cast doubt on her credibility.

## 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

In March 2007 plaintiff was admitted to Research Psychiatric Hospital and, after only 4 days, was discharged in stable condition with her symptoms resolved by medication.

In August 2009 she was discharged from Truman Medical Center after only 3 days. At the time of her discharge, she denied suicidal or homicidal ideation. She was noted to be cooperative with normal mood and affect, normal speech, organized thought processes. She was alert and fully oriented, was future oriented with focused thought content. Memory was intact. Attention and concentration were good.

In August 2011, plaintiff had stopped taking her prescribed mood stabilizer five or six weeks earlier and subsequently reported depression, crying episodes, insomnia, anger, mood swings and anxiety. After only a three-day stay at Two Rivers, plaintiff reported that her mood was "good and even" and she was observed to have a "bright and euthymic" affect.

Plaintiff testified that her medication caused her mouth and facial movements to be "all contorted and weird;" however, she never reported this to any doctor and no person anywhere in the record ever observed contorted or weird mouth or facial movements. On September 25, 2011, plaintiff denied medication side effects. On October 14, 2011, she denied medication side effects. On October 31, 2011, she denied medication side effects. There are no medical records reflecting complaints of any side effects.

## 6. FUNCTIONAL RESTRICTIONS

No medical professional ever recommended that plaintiff not work or that she limit her activities in any way. In fact, Dr. Felitsky disagreed with plaintiff's contention that she was mentally disabled -- "[She is] young and able to work." On October 31, 2011, Shelby Markum, plaintiff's counselor, encouraged her to get a job.

## B.     CREDIBILITY CONCLUSION

In addition to the factors discussed above, I note that other evidence in the record supports the ALJ's credibility determination.  Plaintiff claimed in a function report that she goes most of the week without bathing or brushing her hair; however, she was noted to have good hygiene and grooming on June 23, 2009; August 3, 2010; May 18, 2011; August 1, 2011; August 18, 2011; August 26, 2011; September 20, 2011; September 26, 2011; October 14, 2011; October 31, 2011; April 6, 2012; April 26, 2012; and May 10, 2012.  She was observed at Two Rivers Psychiatric Hospital to be somewhat disheveled; however, when she was originally admitted she was described as neatly groomed.  That one observation during an inpatient stay was the only notation in the entire record of less than adequate grooming or hygiene.

It was noted in a previous application for disability that plaintiff claimed to be suffering from disabling agoraphobia but was able to go out to eat with friends and go to the mall with friends in order to celebrate her birthday and had no difficulty with these enjoyable public activities.

Plaintiff has a history of illegal drug use as confirmed by a urine drug screen at Truman Medical Center.  In February 2012, she admitted having used marijuana as recently as 2011 and methamphetamine in 2009.

In July 2011, Dr. Felitsky's notes reflect that plaintiff was attending sessions with this psychologist only for her court case with the Division of Family Services and to assist her with getting disability benefits.

Plaintiff told a treatment provider at Two Rivers that she previously cut her wrist with a razor; however, the medical records reflect that it was described as a "superficial scratch on her forearm."

Plaintiff told Linda Kurian that according to plaintiff's mother she had developmental delays as a child; however, the records show that plaintiff's mother denied that plaintiff had any developmental milestone delays.

After plaintiff's application for disability benefits was denied by the ALJ, plaintiff began to report new and unrelated symptoms -- hallucinations, paranoia, the belief that others could see her through the television set, hearing sounds that are not there; despite having denied these specific symptoms previously during treatment. She said for the first time that she fell off an untamed horse at 13 which rendered her unconscious and had caused memory problems since that time. She reported debilitating flashbacks from multiple events in her childhood. She reported hand tremors and a three-year period of daily severe alcohol use, yet alcohol use had been denied for years to other treating physicians and plaintiff had never mentioned any of these other serious symptoms to any other treating physician.

Plaintiff's observation that her mother and brother were receiving disability benefits, her decision to apply for benefits a second time after having been denied the first time, her plan to attend mental health treatment with her boyfriend for the express purpose of bolstering their applications for disability benefits, and plaintiff's barrage of new and severe symptoms immediately after the ALJ rendered an unfavorable opinion which noted the absence of some of these symptoms suggests that plaintiff's main motivation is to get on disability. All of this evidence supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not credible.

## VII.   *LISTING 12.05(C)*

Plaintiff argues that the ALJ erred in finding that plaintiff does not meet or equal Listing 12.05(c) for mental retardation. The ALJ analyzed that listing:

> Mark Chamberlain, PhD, administered intelligence testing to the claimant in November 2002 when she was thirteen years old. The claimant scored a performance score of 65

on the Wechsler Intelligence Scare [sic] for Children. The claimant argues that she meets listing 12.05(C) based upon this test result and the claimant's other impairments. I have considered the results of the this [sic] test but find that they are not valid in that they are inconsistent with the claimant's completion of the 11th grade, attainment of a general education degree as well as with her presentation at the hearing. Additionally, there is no mention in the treatment records of the claimant having any difficulty with understandin[g] or comprehending. In fact, the records frequently describe the claimant as having average intelligence. For these reasons the test results from 2002 are considered invalid and the assessment of Dr. Chamberlain is aforded little weight.

(Tr. at 15).

The Eighth Circuit has interpreted Listing 12.05(c) -- mental retardation -- to require a claimant to show each of the following three elements: "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." McNamara v. Astrue, 590 F.3d 607, 610-611 (8th Cir. 2010), quoting Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). "We have emphasized in the past that IQ scores must be valid, that the Commissioner need not rely exclusively on IQ scores, and that the Commissioner may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole." Clay v. Barnhart, 417 F.3d 922, 929 (8th Cir. 2005); Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998). In Clay v. Barnhart, the Court of Appeals noted that, "Ms. Clay did not initially claim mental retardation. . . . The absence of a record of treatment, diagnosis, or even inquiry into a mental impairment prior to applying for benefits weighs against finding there to be an impairment." 417 F.3d at 929.

Regulations specify that IQ tests must be sufficiently current for accurate assessment and the results of IQ tests generally do not stabilize until age 16. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.D.10. As a result, the regulations state that IQ test results obtained between the ages of 7 and 16 are current for a period of only 2 years when the score is 40 or above. Id.

In this case, plaintiff's IQ test score was obtained when she was 13 years of age and is therefore not valid under the regulations. Additionally, Dr. Chamberlain's notes reflect that plaintiff asked how long the test was going to take because she was missing a volleyball game at school that she was excited about attending, casting even more serious doubt about the validity of her score, i.e., it is probable, given her future successful academic performance, that she did not give full effort on the testing and instead rushed through it to get back to her plans.

Plaintiff did not claim mental retardation as a disabling impairment when she applied for disability benefits. She was able to get a GED after only 11 years of schooling and chose to get a GED only because a move to a new school district caused her to be short the number of credits required for graduation.

Furthermore, as the ALJ pointed out, the record is full of findings by mental health professionals that plaintiff's intelligence is average, and there is no instance in the record where anyone questioned her intelligence:

In June 2009, Barbara Larson, a nurse practitioner at Truman Medical Center, noted that plaintiff's fund of knowledge and estimated intelligence were average.

In August 2010 plaintiff's intellectual functioning was noted by Christine Felitsky, Ph.D., to be average with no impairment observed.

In August 2011 plaintiff's intelligence was noted to be average at Two Rivers Psychiatric Hospital. During a learning assessment, it was noted that plaintiff is "eager to learn" and learns best by listening and reading as opposed to demonstration or participation; she reported "no learning barriers."

In August 2011, Dr. Ulusarac found that plaintiff's intelligence was average "evidenced by vocabulary and fund of knowledge."

In August 2011, Dr. Young found that plaintiff's intelligence was average by fund of knowledge as well as by vocabulary.

In September 2011, Dr. Young observed that plaintiff's intelligence was average.

In October 2011, Dr. Young observed that plaintiff's intelligence was average.

It was not until after the ALJ rendered her opinion that plaintiff began reporting learning difficulties to her treating doctors.

The substantial evidence in the record supports the ALJ's finding that plaintiff does not meet or equal Listing 12.05(c).

## VIII.   RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ improperly assessed plaintiff's residual functional capacity because plaintiff's mental impairment is worse than what was accounted for by the ALJ.  This argument is without merit.

The medical records support the ALJ's finding with regard to the severity of plaintiff's mental impairment.

On June 20, 2009, Barbara Larson, nurse practitioner, observed that plaintiff was alert and oriented with normal speech, organized thought process, intact memory, good attention, good concentration.

On June 21, 2009, she was noted to be cooperative and her thought processes remained logical.

On June 23, 2009,  she was noted to be cooperative with normal mood and affect, normal speech, and organized thought process.  She was alert and fully oriented, was future oriented and had focused thought content.  Memory was intact. Attention and concentration were good.

On August 30, 2010, she was noted to have was neat, clean and appropriate appearance. She was isolative and withdrawn with a depressed/sad mood and affect, but her thinking style was noted to be normal. Her thought content was normal. Insight and judgment were normal.

On October 23, 2010, Dr. Reddy observed that plaintiff was alert and oriented times three. Her insight and judgment were described as good.

On December 3, 2010, Dr. Reddy observed improved mood with appropriate affect. Plaintiff had good insight, good judgment.

On January 24, 2011, Florence Oni, ARNP, observed that plaintiff's mood was slightly depressed, her memory was intact. Plaintiff denied thoughts of harm to herself or others.

On March 23, 2011, Ms. Oni noted that plaintiff presented as slightly depressed with a pleasant affect. Her memory was intact.

On April 12, 2011, Dr. Felitsky observed that plaintiff was "doing well."

On May 18, 2011, Ms. Oni noted that plaintiff's mood was slightly depressed, her memory was intact, she was well groomed and well dressed.

On June 12, 2011, Dr. Felitsky noted that plaintiff was "doing well."

On August 1, 2011, Ms. Oni observed that plaintiff was casually dressed with clean appearance. Her mood was slightly depressed with congruent affect. Memory was intact. This was after plaintiff had stopped taking her medication five or six weeks earlier.

On August 18, 2011, plaintiff was observed to be neatly groomed, calm and cooperative. Dr. Ulusarac found that plaintiff's concentration and attention span were intact.

On August 22, 2011, plaintiff reported that her mood was "good and even"; her affect was observed to be "bright and euthymic." Plaintiff was eating and sleeping well and denied

any racing thoughts.  As far as her anxiety, she said, "the Geodon definitely helped."  She denied suicidal ideation.

On August 23, 2011, Dr. Young observed that plaintiff was pleasant, polite, cooperative, well-groomed with good eye contact.  Speech was normal and goal directed.  Her mood was "more stressed out" and her affect seemed to be somewhat more anxious and irritable "due to not being on the Geodon at this time."  Plaintiff denied being suicidal or homicidal.  She denied any auditory or visual hallucinations.  No thought blocking or paranoia was noted.  She was alert and oriented to person, place, and time.  She was attentive with the interview and showed no confusion.  She had good immediate recall.  Insight and judgment were suboptimal, but improved.

On August 26, 2011, plaintiff was observed to have a normal appearance, she had cooperative behavior, she was fully oriented, her speech was normal, her affect was normal, her thought processes were normal.

On September 25, 2011, plaintiff's appearance was normal, behavior was normal, attention was normal, concentration was normal, eye contact was good, speech was normal, memory was normal, socialization was normal.

On September 26, 2011, plaintiff was observed to be well groomed with good hygiene.  Her memory was normal.  She was alert and fully oriented.  Her attention was normal.  Her concentration was normal.  Her impulse control was normal.  Psychomotor activity was normal.  Eye contact was normal.  Attitude was pleasant and cooperative. Affect was euthymic.  Sleep was normal.  Speech was normal.  Thought process was normal.  Thought content was normal.  Insight was poor, judgement was fair.

On October 14, 2011, plaintiff's appearance was normal, behavior was normal, attention was normal, concentration was normal, eye contact with good, speech was normal, mood was anxious. Her immediate, short-term and long-term memory was normal.

On October 31, 2011, plaintiff's appearance and behavior were normal, attention and concentration were normal, eye contact was good. Speech was normal, suicidal ideation was denied, no psychosis was alleged or observed, mood was good, affect was euthymic and full. Anxiety was "within normal limits." Memory was intact. Socialization was normal.

On March 21, 2012, plaintiff was described as alert and fully oriented, calm, cooperative. She had good eye contact, good rapport, normal speech, fair insight and judgment.

On April 18, 2012, plaintiff's mental status exam was normal except her affect appeared dysphoric.

On April 26, 2012, plaintiff reported that she was exercising and getting fit.

This record of essentially normal mental findings over a period of several years supports the ALJ's findings.

Plaintiff's argument regarding the GAF findings in the medical record is not persuasive. The ALJ discussed the GAF scores and noted that in large part they were inconsistent with the treatment notes which generally indicated that plaintiff was doing well, her mental status examinations were in large part unremarkable, and in some of the records the substance of the GAF findings appeared to have been copied from visit to visit and did not correspond with the substance of the medical visit. Additionally, as the ALJ recognized, no direct comparison can be made between GAF scores and the degree of work-related limitation for Social Security disability purposes. The GAF scale is intended for use by practitioners in making treatment decisions. See Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV) at 32-33.

GAF scores are impressions of the patient's overall functioning including factors unrelated to the ability perform substantial gainful activity, and they have no direct correlation to a claimant's residual functional capacity. <u>Howard v. Commissioner of Social Security</u>, 276 F.3d 235, 241 (6th Cir. 2002).

## IX.    CONCLUSIONS

Plaintiff's final argument challenging the ALJ's reliance on the testimony of the vocational expert is without merit. A hypothetical is sufficient if it includes the impairments supported by substantial evidence and found credible by the ALJ. <u>Blackburn v. Colvin</u>, --- F.3d ---, 2014 WL 3746882 (8th Cir., July 31, 2014).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 11, 2014